25CA0833 Stuper v Denver 04-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0833
City and County of Denver District Court No. 23CV31467
Honorable Jon J. Olafson, Judge

---

Cory Stuper and Brian Finneran,

Plaintiffs-Appellants,

v.

City and County of Denver,

Defendant-Appellee.

---

ORDER AFFIRMED

Division VII
Opinion by JUDGE JOHNSON
Pawar and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 30, 2026

---

Lane Pass & Associates, P.C., Sean J. Lane, Brittney M. Townsley, Aurora, Colorado, for Plaintiffs-Appellants

Miko Brown, City Attorney, Jennifer L. Jacobson, Assistant City Attorney, Denver, Colorado, for Defendant-Appellee

¶ 1    Plaintiffs — two police officers employed by the Denver Police Department (the Department) — Cory Stuper (Officer Stuper) and Brian Finneran (Officer Finneran) (collectively, the officers), appeal the district court's order affirming the disciplinary action imposed against them by the Denver Civil Service Commission (the Commission), an agency of defendant, the City and County of Denver (the City).

¶ 2    The officers allege that the Commission erred by (1) upholding the hearing officer's determination that an exigent circumstance existed for the officers to remain in the victim's home after the victim revoked consent for them to be in the residence; (2) failing to address the City's nondisclosure of a video under Denver Civil Service Commission Rule 12 (Commission Rule 12); and (3) failing to address the City's spoliation of the record and late disclosure of evidence, resulting in insufficient evidence to support the discipline imposed and violating their due process rights.  We disagree with their contentions and, therefore, affirm the Commission's decision.

I.    Background

¶ 3    In June 2021, the officers responded to a 911 call involving a domestic violence incident between the victim and a male

1

perpetrator.  The daughter of the victim called 911 after receiving multiple distressed phone calls from her mother.  The 911 dispatcher provided the officers with call notes indicating what the daughter heard on the phone with her mother.

¶ 4     The officers arrived at the residence roughly fifteen minutes after the daughter reported the incident.  Upon their arrival, the home was unlit, and the officers saw no signs of movement inside.  A man then exited the front of the residence, consented to the officers entering the premises, and admitted that he and the victim had an argument earlier in the evening.

¶ 5     In the home, the officers spoke briefly with the victim, who remained under the covers of her bed throughout the conversation.  She told the officers that she was okay, but the man was nearby during the police questioning.  After she told the officers to leave, they did so.

¶ 6     Unbeknownst to the officers, the victim endured internal bleeding and a ruptured spleen and did not receive medical attention until her son-in-law arrived later in the evening, having traveled from Colorado Springs to check on his mother-in-law.  She

spent five weeks in the hospital and required five surgeries to address the injuries she sustained.

¶ 7     In July 2022, as part of an investigation handled by the Department, the Chief Deputy Executive Director of the Denver Department of Safety issued a "Departmental Order of Discipline Action" (Departmental Order), determining that the officers violated the Denver Police Department Operations Manual, Rules and Regulations 105 (RR-105), "Conduct Prejudicial," by failing to adequately investigate a domestic violence incident.  RR-105 states:

> Officers shall not engage in conduct prejudicial to the good order and police discipline of the Department or conduct unbecoming an officer which:
>
> a. May or may not specifically be set forth in Department rules and regulations or the Operations Manual; or
>
> b. Causes harm greater than would reasonably be expected to result, regardless of whether the misconduct is specifically set forth in Department rules and regulations or the Operations Manual.

Specifically, the Departmental Order determined that the officers failed to fully investigate the reported domestic violence incident and that they admitted they never separated the victim from the

3

man "when attempting to ascertain what occurred." The Departmental Order concluded that the officers' conduct constituted a "Conduct Category D" violation under the Operations Manual and resulted in a presumptive penalty of a ten-day suspension. The officers appealed the Departmental Order to the Commission, which affirmed.

¶ 8    The officers then appealed to the district court under C.R.C.P. 106(a)(4), alleging that the administrative body acted arbitrarily and capriciously and that the decision could not be upheld because portions of the agency record were missing.[1] The district court affirmed the Commission's decision, reasoning that there was competent evidence to support its decision to impose sanctions against the officers, including (1) video footage from inside the home capturing the domestic violence incident and the officers' interaction with the victim; (2) statements from the victim; (3) statements from the victim's daughter; and (4) statements from both officers. The district court also reasoned that, while it was

---

[1] The officers' administrative proceedings were separate cases, but the district court consolidated their separately filed C.R.C.P. 106(a)(4) actions.

unfortunate that a portion of the record was missing, other substantial evidence in the record supported the sanctions imposed against the officers.

## II.    Standard of Review and Applicable Law

¶ 9    C.R.C.P. 106(a)(4) authorizes the district court to review decisions of any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions. *Johnson v. Dep't of Safety*, 2021 COA 135, ¶ 16. We review the agency's decision de novo. *Id.* As a result, we review the administrative agency or body's decision, not the district court's decision. *Id.* We affirm an administrative body's decision unless "the governmental entity exceeded its jurisdiction or abused its discretion, which occurs if the body misapplied the law or no competent evidence supports its decision." *Id.* (citation omitted).

¶ 10    For judicial review of agency decisions, "competent evidence is the same as substantial evidence." *Burns v. Bd. of Assessment Appeals*, 820 P.2d 1175, 1176 (Colo. App. 1991). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *City of Colorado Springs v. Givan*, 897 P.2d 753, 756 (Colo. 1995) (citation omitted);

*see also Kruse v. Town of Castle Rock*, 192 P.3d 591, 601 (Colo. App. 2008) ("A record lacking any competent evidence means that the ultimate decision of the administrative body is so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." (quoting *Widder v. Durango Sch. Dist. No. 9-R*, 85 P.3d 518, 526-27 (Colo. 2004))). We may not weigh evidence or substitute our judgment for that of the administrative agency. *See Kruse*, 192 P.3d at 601.

## III.   Analysis

¶ 11    The officers contend that the discipline imposed against them is contrary to the Fourth Amendment to the United States Constitution, as the victim revoked her consent for them to be in the residence. They also contend that the City engaged in discovery violations and spoilation of the record. We disagree with their first contention and determine that portions of their second contention were not preserved but that, even if they were preserved, any errors were harmless.

### A.   Fourth Amendment

¶ 12    The Commission found that the officers knew that a possible domestic violence incident occurred based on the call notes

provided to them from dispatch, as well as the fact that the man admitted to arguing with the victim earlier in the evening, and yet the officers did not separate the victim from her abuser when questioning whether she needed assistance.

¶ 13    The Commission's findings are supported by the record. Specifically, the victim's daughter told a 911 operator that her mother had called her five times; that she could hear her mother say things like "don't touch me"; that the phone would disconnect; and that, in one of the calls, her mother "whispered" to call the police.

¶ 14    One of the officers acknowledged that the man admitted that he and the victim had argued earlier but denied that any incident was occurring at the time. The man then led the officers to the bedroom where the victim was located. Officer Finneran entered the bedroom, while Officer Stuper waited outside the doorway, creating a barrier between the man and the doorframe. But, as the Commission found, the officers never established a visual or auditory barrier between the suspect and the victim while Officer Stuper questioned her.

¶ 15    The lights were off in the bedroom.  Officer Finneran shined his flashlight on the victim and asked whether she was okay, informing her that the officers had arrived to check on her.  The victim replied, "I'm okay, what's going on? . . .  [C]an you shut that flashlight off?"  The officer then asked whether he could turn on the overhead light, to which the victim responded, "No, I'm trying to sleep.  What are you guys doing?  I need you to get out."

¶ 16    The officers left after an estimated three-minute investigation inside the residence.

¶ 17    The Commission concluded that (1) the dispatcher's call notes sufficiently established exigent circumstances that would have justified their continued presence in the home; (2) police training required the officers to separate the man from the victim because his presence made her less likely to be forthcoming; and (3) the officers could have called for a third officer if they could not have separated the parties due to officer safety, but failed to do so.  As a result, the Commission upheld the Departmental Order.

¶ 18    Although the Commission did not cite any specific case law, we nonetheless agree with its Fourth Amendment analysis.

¶ 19    Under the Fourth Amendment, a warrantless entry into a home by police may be justified if there are exigent circumstances or if an emergency exists. *People v. Chavez*, 240 P.3d 448, 450-51 (Colo. App. 2010). The two exceptions are distinct, as "the former requires traditional probable cause while the latter requires an objectively reasonable basis for believing immediate aid is required inside." *Id.* at 451. But sometimes "[t]he 'emergency doctrine' exception to the warrant requirement is but a specific example of the exigent circumstances doctrine." *Id.* (quoting *People v. Thompson*, 770 P.2d 1282, 1285 (Colo. 1989)). In the case of domestic violence, however, "the distinction between the two doctrines often collapses because the same facts that give rise to the exigency also provide probable cause of a suspected crime." *Id.* (quoting Amanda Jane Proctor, *Breaking into the Marital Home to Break Up Domestic Violence: Fourth Amendment Analysis of "Disputed Permission,"* 17 Am. U. J. Gender Soc. Pol'y & L. 139, 142 (2009)).

¶ 20    Courts have "accorded great latitude" to officers responding to emergency reports of ongoing domestic violence. *Chavez*, 240 P.3d at 451 (quoting *United States v. Brooks*, 367 F.3d 1128, 1136 (9th

Cir. 2004)). While courts have declined to hold that a domestic violence situation creates a per se exigent circumstance, they are "cognizant" of the difficulties these cases present when evaluating the reasonableness of an officer's actions. *Id.*

¶ 21 The officers rely on *Chavez* to argue that, despite a division of this court upholding the reasonableness of the officers' actions in that case, the facts in this case are distinct. They contend that exigent circumstances existed in that case based on the daughter fleeing the home and reporting a domestic violence incident between the mother and the father, which also included the daughter reporting there were weapons inside the residence, even if they had not been used during the altercation. *See id.* Here, on the other hand, the officers contend no exigent circumstances existed because no one had fled the home, and they had no reports of weapons being present.

¶ 22 But some of *Chavez*'s principles are relevant to the Commission's view that the officers did not act reasonably, thus violating RR-105. For example, the victim's daughter had personal knowledge of the incident, and because the officers had no reason

to believe the daughter would fabricate her report, her statement was presumptively valid. *See Chavez*, 240 P.3d at 452.

¶ 23    The officers attempt to discredit or downplay the statements made by the victim's daughter by contending that, because they had not spoken directly with her, they could not assess her credibility. And they further note that the daughter mentioned that her mother had a history of mental health issues and illicit drug use. But based on these facts, the officers had no reason to suspect the daughter, as the reporting party, might be fabricating that (1) her mother had called her repeatedly; (2) her mother's statements were consistent with a domestic violence incident occurring; and (3) her mother was asking for intervention. Therefore, even under *Chavez*, the officers should have treated the daughter's statements to the 911 dispatcher about possible domestic violence as presumptively valid. *See id.*

¶ 24    Likewise, the exigent circumstances the officers confronted escalated — rather than decreased — when they arrived at the location because, like in *Chavez*, the officers were presented with an unlit house and then encountered the male who admitted that there had been a verbal altercation between him and the victim. As the

Commission reasoned, the male's admission of an earlier argument, along with the dispatch information the officers had received, was "sufficient to provide exigent circumstances to permit them to investigate more thoroughly to determine whether the [victim] was in need of assistance."

¶ 25 Finally, unlike in *Chavez*, the officers did not separate the parties, as their domestic violence training had taught them. The victim's later statement revealed that she did not feel safe to let the officers know that she could not move from the bed due to her extensive injuries but that if they had separated her from the perpetrator, she would have told the police she needed help. We conclude that, although the facts are somewhat different in *Chavez*, the principles underlying an officer's duty to investigate the potential for domestic violence support the Commission's evaluation and ultimate conclusion that the officers acted unreasonably and failed to fully investigate the situation.

¶ 26 The officers also rely on *Georgia v. Randolph*, 547 U.S. 103, 118 (2006), for the proposition that law enforcement officers must immediately terminate a warrantless search upon an occupant's revocation of consent. But even if the officers viewed the victim's

statements as revoking consent — as they claim they did — the officers failed to mention that *Randolph* goes on to say, "[T]his case has no bearing on the capacity of the police to protect domestic victims." *Id.* The Court further stated that if the police "have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering" a residence "to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected." *Id.* In such a situation, the Court concluded that "the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes." *Id.*

¶ 27 Given the totality of the record, we conclude that there is substantial evidence to support the Commission's decision affirming the Departmental Order.

B. Discovery and Spoliation of the Record

¶ 28 Next, the officers contend that the Commission's decision cannot be upheld because the City (1) failed to disclose two videos to them which the hearing officer relied on in violation of Commission Rule 12; (2) failed to maintain the agency record

13

because two hearing transcripts are missing; and (3) untimely disclosed over 200 pages of discovery a week before the hearing.

### 1. Undisclosed Videos

¶ 29 There are three videos that appear to be at play: two of which were designated as City exhibits and are included in the record on appeal and a third — not contained in the record — which consists of a series of videos combined into one fifty-one-minute video.[2] The third video purportedly depicts the argument between the victim and the male perpetrator, but it was not included in the internal investigatory report leading to issuance of the Departmental Order due to its "extremely graphic nature." According to an internal affairs memo, however, the video was maintained in the internal affairs file.

¶ 30 Commission Rule 12, section 7, deals with discovery in the context of disciplinary proceedings. As relevant, section 7(A)(1)(a) states that the petitioner shall be provided reasonable access to or copies of "[t]he full and complete Department Internal Affairs

---

[2] To the extent the officers claim there is another video missing, we can discern no mention of such a video in the record and assume they mean the fifty-one-minute video since it comprises multiple clips.

investigation file(s) . . . upon which the disciplinary action is based in whole or in part."

¶ 31     We assume that the officers have been unable to secure a copy of the fifty-one-minute video because it is not included in the agency record on appeal. Therefore, to the extent the Departmental Order relied on the video, even in part, to impose discipline, we agree with the officers that the video should have been made available.

¶ 32     But the City contends that this issue is not preserved. The City asserts that the officers requested a continuance to view the video. The officers now contend that they were provided with the wrong one. As a result, the City argues that there is nothing in the record to support that the officers took any action before the Commission to rectify the situation, such as asking for another continuance or filing a motion to obtain the correct video. It is true that the officers did not seek further relief from the Commission. We do not condone the City's failure to provide the video to the officers, as it was obligated under Commission Rule 12 to provide them the file upon which the Department relied to impose

discipline. Even so, we ultimately agree with the City that this issue is unpreserved.

¶ 33 While we generally do not review unpreserved issues in civil cases, *see Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1269 (Colo. App. 2010), we conclude that, even if this issue was preserved, any error was harmless. In the civil context, an error is harmless if it does not affect the substantial rights of the parties. C.R.C.P. 61. "An error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *People in Interest of R.D.*, 2012 COA 35, ¶ 25 (quoting *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010)).

¶ 34 The City contends, and we agree, that the video would be relevant only if the officers had intended to assert that the verbal argument between the victim and the male perpetrator happened *after* the officers' visit, a contention they did not make below or raise on appeal. In other words, while the video likely highlighted how severe the domestic violent incident was between the victim and the man, this does not change the facts in the record that the officers failed to fully investigate the circumstances. Based on the

description of the fifty-one-minute video, we cannot say that having it in the record would have changed the outcome of the proceeding in favor of the officers.  *See R.D.*, ¶ 25.

### 2.    Spoliation of the Record

¶ 35    Similarly, the officers contend that the record contains insufficient evidence to affirm the discipline against them because two hearing transcripts from December 6, 2022 and March 22, 2023 are missing from the record.  They also contend that the missing records violate their due process rights.

¶ 36    The December 6 hearing ostensibly concerned the City's failure to disclose the fifty-one-minute video and how the City would address the situation.  And the March 22 hearing was when the officers testified to what occurred on the night of the incident.  The officers contend that the March 22 hearing contains the only testimony from them which presented the facts of the underlying incident that led to their discipline.

¶ 37    The officers concede that the loss of portions of an administrative record does not automatically entitle them to reversal of the agency's decision.  *See Gilbert v. Julian*, 230 P.3d 1218, 1221 (Colo. App. 2009) (despite missing documents the

17

agency failed to submit, the appellate court was able to conduct meaningful judicial review of the issue raised on appeal); *Goodwill Indus. of Colo. Springs v. Indus. Claim Appeals Off.*, 862 P.2d 1042, 1046 (Colo. App. 1993).

¶ 38   Nonetheless, they contend that because the hearings dealt with the discovery dispute concerning the video and their testimony, the record lacks competent evidence to support the imposition of discipline against them.  We disagree for two reasons.

¶ 39   First, we have already concluded that the video issue was unpreserved and that any assumed error was harmless.  Because of this conclusion, we also do not see how having the December 6 hearing transcript or video would have affected the outcome of the proceeding in the officers' favor.  *See R.D.,* ¶ 25.

¶ 40   Second, we disagree that the record does not contain the officers' testimony.  True, we do not have their testimony from the March 22 hearing, but the record contains audio recordings of the predisciplinary hearings for both officers held on June 9, 2022, in which they told investigators their positions.  They have not raised how their June 9 statements differ from the testimony they presented at the March 22 hearing.

¶ 41    More importantly, we agree with the City that, at hearings before the Commission, agency decisions are not reviewed de novo. Under Commission Rule 12, section 11(D), the Commission's review of an agency decision "shall be limited to" (1) new and material evidence; (2) an erroneous interpretation of Departmental or Commission Rules; (3) policy considerations that may have effect beyond the scope of the case at hand; or (4) inconsistencies in the discipline affirmed or imposed under similar circumstances.

¶ 42    The officers do not make any argument that they attempted to raise new or material evidence at the Commission hearings that would be different from the statements they made at the prediscipinary hearings or that are reflected in the Departmental Order.  Likewise, under Commission Rule 12, section 11, subsections (J)(4) and (J)(5) state, respectively, that, absent the officers attempting to raise new or material evidence, "the Commissioners shall rely only upon the evidence presented to the Hearing Officer" and that "[a]ll findings of evidentiary fact by the Hearing Officer shall be binding on the Commissioners[, who] may not resolve disputed issues of fact."  Therefore, while we certainly do not condone the City misplacing the transcripts of the Commission

19

hearings, absent the officers attempting to raise new and material evidence, we cannot say that our agency review was impeded by the missing portions of the record. Thus, we conclude there is competent evidence in the record to support the Commission's discipline against the officers.

¶ 43    Likewise, to the extent the officers contend that the missing portions of the record (and the missing fifty-one-minute video) violated their due process rights, we conclude that their arguments are conclusory and fail to cite any legal authority. Consequently, we decline to address this issue as it is undeveloped. *See Holcim U.S. Inc. v. Colo. Pub. Utils. Comm'n*, 2025 CO 1, ¶ 47 (a claim is not sufficiently presented for appellate review when it is stated in a conclusory fashion without legal citation).[3]

### 3. Late Disclosure of Documents

¶ 44    Finally, the officers challenge the late disclosure of over 200 pages of discovery a week before the Commission hearing. The

---

[3] To the extent the officers rely on the State Administrative Procedure Act, sections 24-4-101 to -109, C.R.S. 2025, for some or all of their contentions relating to the discovery violations and spoliation of the record, we need not address this argument because we have resolved their contentions under the Denver Civil Service Commission Rules, as appropriate.

documents included: the Denver Police Department Disciplinary Handbook, the Denver Police Department Operations Manual, training materials on domestic violence, and a PowerPoint regarding domestic violence incidents. The City withdrew three of these four exhibits at the hearing on December 6, leaving only the PowerPoint.

¶ 45 The City offered to let the officers' counsel speak with the City's witness who was anticipated to testify about the PowerPoint. The officers have not directed us to, nor have we been able to locate, any reference in the record that defense counsel sought any further continuances or rulings suggesting they were adversely impacted by the late disclosure of the PowerPoint or that the City did not make its witness available for questioning. Because the officers have failed to show where they continued to object to the late disclosure of the PowerPoint, we deem this issue unpreserved. *See Wycoff*, 251 P.3d at 1269.

## IV. Conclusion

¶ 46 We affirm the Commission's order upholding the Departmental Order.

JUDGE PAWAR and JUDGE GOMEZ concur.